IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION



**EOD**

04/07/2009

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| **JAMES BRADLEY COLLIER** | § | Case No. 07-20204 |
| xxx-xx-2913 | § | |
| P. O. Box 236, Scottsville, TX 75688 | § | |
| | § | |
| Debtor | § | Chapter 13 |

| | | |
|---|---|---|
| JAMES BRADLEY COLLIER | § | |
| | § | |
| Plaintiff | § | |
| | § | |
| v. | § | Adversary No. 08-2004 |
| | § | |
| PAUL HILL | § | |
| | § | |
| Defendant | § | |

## MEMORANDUM OF DECISION

This matter is before the Court on the trial of the Complaint for Injunctive Relief,

Contempt and Damages filed by the Plaintiff, James Bradley Collier, the Debtor in the

above-referenced bankruptcy case.  The complaint seeks a determination that the

Defendant, Paul Hill, willfully violated 11 U.S.C. § 362(a) and is liable for actual

damages, costs, and attorney's fees.  Upon conclusion of the trial of the complaint, the

Court took the matter under advisement.  This memorandum of decision disposes of all

issues pending before the Court.[1]

---

[1]     This Court has jurisdiction to consider the Complaint pursuant to 28 U.S.C. §1334(b) and 28 U.S.C. §157(a).  The Court has the authority to enter a final judgment in this adversary proceeding because it constitutes a core proceeding arising under title 11 as contemplated by 28 U.S.C. §157(b)(1).

## **Background**[2]

Prior to the filing of his bankruptcy petition, the Debtor, James Bradley Collier and the Defendant, Paul Hill, were longtime, close friends living in Scottsville, Texas, located east of Marshall.[3] In the spring of 2007, Collier desired to make certain improvements to his mobile home. On three separate occasions, he purchased on credit from the Defendant's store, Hill's Mobile Home Parts & Service, various mobile home parts and materials, including doors, floor vents, faucets, and pipes, thereby incurring a debt of $984.23.[4] Hill even assisted his friend in the remodeling and helped Collier to install the purchased parts free of any labor charge. Over the next few months, as he began to experience financial problems, Collier continually assured Hill that he would pay his outstanding debt for the mobile home parts.

As his financial problems worsened, Collier consulted with Jean Taylor, a bankruptcy attorney in Marshall. The result of those consultations was the filing of a voluntary petition by Collier for relief under Chapter 13 of the Bankruptcy Code on September 28, 2007. Accompanying Collier's petition were his schedules and statements wherein Collier scheduled Hill's pre-petition claim as an unsecured claim on Schedule F. Collier also supplied a mailing matrix that listed Hill as a creditor with an address of

---

[2]  The agreed facts set forth by the parties in the Pre-Trial Order [dkt #40] are incorporated herein by reference as if fully set forth.

[3]  For example, the Debtor was a pallbearer at the funeral of Mr. Hill's mother.

[4]  *See* Defendant's Ex. A.

"9350 E. Hwy. 80, Marshall, Texas 75672."

There were immediate problems with delivery of notice to Hill at that address. Collier claimed this was the address that Hill provided to him. Hill denied that and asserted that his address was as indicated on the invoices submitted to the Court as Defendant's Ex. A: *9350 US Hwy 80 East, Scottsville, TX 75688.*[5] Both addresses, however, appear to be ineffective mailing addresses due to the fact that the physical address technically exists within the confines of the city of Marshall, but the small community of Scottsville has its own post office and its own zip code but that zip code services only post office boxes located within that post office. To complicate things further, the Bankruptcy Noticing Center utilized by the Court apparently automatically corrected the zip code on each notice addressed to the physical address by changing 75672 to 75670, which is the primary zip code for downtown Marshall — but not a zip code for physical addresses in the Scottsville area. As a result, every notice sent by BNC to Hill was sent to 9350 E. Hwy. 80, Marshall, Texas 75670, though that likely was not a deliverable address.

These "postal" circumstances created tension between these estranged friends.

---

[5] That address is ineffectual since it is an improper combination of the Marshall physical address and the Scottsville zip code that does not apply to physical addresses. To the extent that mail gets delivered to that address, one can only speculate that such delivery is likely attributable to mail being delivered to the Scottsville post office (through the zip code) into the hands of postal employees familiar with people and companies in that small community who can then reroute the delivery process. It appears as though that may have occurred at least once in this case. See Defendant's Ex. D. However, the fate of the other notices sent by the Bankruptcy Noticing Center has not been established.

Hill wanted to be paid.  Collier continually told Hill that he had filed for bankruptcy relief and assured him that his claim had been properly scheduled.  Yet Hill was not timely receiving documentation from the bankruptcy court to corroborate Collier's assurances, although Collier was not really responsible for the delay in notice.

As a result of that delay in notice, Hill and his representatives[6] placed a number of phone calls to Collier between the petition date in September 2007 and early February 2008, seeking confirmation as to the existence of the purported bankruptcy case and whether his debt had been included in the bankruptcy case.  On or about February 7, 2008, one of Mr. Hill's employees finally called Jean Taylor, the Debtor's bankruptcy attorney, to confirm the information about the bankruptcy.  Oral confirmation was given but no paper work followed.  At the end of April, a new employee of Hill, Linda Simmons, contacted Collier about the status of the debt.  On May 1, 2008, Hill personally called Taylor's office, leaving a voice mail message that he had still not received any communication from the bankruptcy court to date regarding his claim or any other documentation that corroborated the existence of the bankruptcy filing but in that message, for the first time, he disclosed his post office box address in Scottsville to Taylor.  Still no corroborating documentation was sent.  Five days later, Linda Simmons spoke by phone to Jean Taylor and again requested that copies of Collier's bankruptcy information to be sent to Hill's post office address.  In response thereto, Taylor finally

---

[6] These contacts were initiated by Hill, his brother, and by Hill's employee, Linda Simmons.

-4-

mailed a letter to Hill on May 7 at that post office box address, enclosing a copy of the

"Notice of Bankruptcy Case Filing," procured from PACER, which detailed all of the

relevant case information.[7]  This information prompted Hill to retain an attorney, Josh

Maness, for assistance in collecting his pre-petition claim.  Although Maness had the

ability to confirm all of the case and claim information which had been sent to Hill, he

conducted only a "creditor search" from the Query section of the website and failed to

find any reference to Paul Hill.  Throughout this time period and notwithstanding the

information provided in the Notice, there was apparently no effort by the Defendant, his

subordinates, or his counsel to contact the bankruptcy court in Tyler directly for

confirmation of the bankruptcy filing or any of the case information.

Two months later, on July 11, 2008, Maness, on Hill's behalf, sent the following

letter to Jean Taylor:

Re: Debt collection on Brad Collier; Tim Moran & Paul Hill.

Please accept this letter as a formal demand for payment of two outstanding
debts owed by your client Brad Collier.  The first debt concerns $4000 in
unpaid rent to Mr. Tim Moran for office space located adjacent to the "grub
sack" on highway 80.  Mr. Collier failed to pay rent for approximately
thirty-six months, ending in December 2004.

The second debt concerns $987.37 in parts and supplies sold by Mr. Paul
Hill to Mr. Collier for mobile home related repairs.  This debt is
approximately one year old.

I am aware that he has recently filed for protection under Chapter 13 of the
U.S. Bankruptcy Code.  These debts however were not disclosed by him to

---

[7]  Plaintiff's Ex. 1.

the bankruptcy court.  Furthermore, it is my understanding that the trustee closed the bankruptcy case.[8]

Your client is aware of these two debts and had repeatedly promised to make good on them to my clients.  To date he has failed to do so. Therefore, if payment in full is not received by **July 25, 2008**, I will have no choice but to file suit on behalf of my clients.  Furthermore, they will be seeking costs, attorney's fees, and interest as allowable under Texas law for contract claims and suits on sworn accounts.

Please do not hesitate to call if you need anything further.

Sincerely,
Josh B. Maness[9]

After receipt of the letter, Taylor called Maness to inform him that Collier's bankruptcy case was not closed and she again asserted that Hill's debt had been properly scheduled. Apparently the prescribed process was not satisfactory to Mr. Hill.

Three weeks later, on July 31, 2008, Hill posted a large sign outside of his business location, near the major intersection of US Highway 80 and FM 2199 in the heart of the small Scottsville community.  Displayed in a manner consistent with the sign announcing the presence of Hill's business and, thus, clearly visible from the roadway, the sign read:

**BRAD COLLIER**
**OWES ME $984.23**
**WILL YOU PLEASE**
**COME AND PAY ME!**[10]

---

[8]  This statement was clearly incorrect.

[9]  Plaintiff's Ex.2 (emphasis in original).

[10]  Plaintiff's Ex. 3 (emphasis in original).

-6-

When Collier arrived at work that morning, his supervisor informed him of the sign. Collier's initial response was one of disbelief until he was shown a photograph of the sign. Collier claims that, by the end of the workday, he had received nearly 60 phone calls from friends and neighbors about the sign. For the next 21 days, this sign was displayed by Hill in public view on the main thoroughfare in Scottsville during normal business hours. It triggered the filing of this adversary proceeding seeking damages under §362(k). The sign was removed only after an initial emergency hearing conducted before this Court on August 21, 2008, at which time Hill agreed to the entry of a preliminary injunction prohibiting the display of the sign pending the final resolution of this matter.[11] At the conclusion of the evidentiary hearing on this matter, the Defendant agreed to the continuation of the preliminary injunction blocking the display of the sign pending a ruling by this Court.

## Discussion

*§362(k)*

When a bankruptcy petition is filed, an automatic stay immediately becomes effective and operates as a self-executing injunction that prevents creditors from pursuing any collection efforts against the debtor for pre-petition debts. *Campbell v. Countrywide Home Loans*, 545 F.3d 348, 354-355 (5th Cir. 2008). However, the automatic stay protects creditors as well as debtors. *Brown v. Chesnut (In re Chesnut)*, 422 F.3d 298,

---

[11]  Plaintiff's Ex. 5.

301 (5th Cir. 2005).  As the Fifth Circuit explained in *Chesnut*, "Without the stay,
creditors might scramble to obtain as much property of the debtor's limited estate as
possible.  The automatic stay prevents this scramble by providing 'breathing room' for the
debtor and the bankruptcy court to institute an organized repayment plan."  *Id.* (citing *In
re Stembridge*, 394 F.3d 383, 387 (5th Cir. 2004)).

Because the protections afforded by the automatic stay are so integral to the goals
of the bankruptcy process, Congress gave debtors a private right of action to sue for
violations of the stay, now codified as 11 U.S.C. § 362(k),[12] which provides:

> [A]n individual injured by any willful violation of a stay provided by this
> section shall recover actual damages, including costs and attorneys' fees,
> and, in appropriate circumstances, may recover punitive damages.

11 U.S.C. § 362(k)(1); *see Pettitt v. Baker*, 876 F.2d 456, 457 (5th Cir. 1989).  This
Circuit has held that a "willful" violation does not require proof of a specific intent to
violate the automatic stay.  *See Chesnut*, 422 F.3d at 302.   "Rather, the statute provides
for damages upon a finding that the defendant knew of the automatic stay and the
defendant's actions which violated the stay were intentional."  *Id.*  Furthermore, "whether
the [defendant] believes in good faith that it had a right to [act contrary to the statute] is
not relevant to whether the act was 'willful' or whether compensation must be awarded."
*Id.*

---

[12]   Prior to the passage of the Bankruptcy Abuse Prevention and Consumer Protection Act of
2005 (hereafter referenced as "BAPCPA"), this provision was referenced as "§362(f)."

Collier alleges that Hill violated the automatic stay by: (1) engaging in phone calls and other contacts to collect his debt; (2) sending the demand letter of July 11th to Collier's bankruptcy attorney; and (3) posting the sign in Scottsville demanding payment of the debt. Thus, Collier must demonstrate by a preponderance of the evidence the existence of three elements in order to establish a claim under § 362(k): (1) Hill must have known of the existence of the stay; (2) Hill's actions were taken intentionally; and (3) those actions constituted stay violations. *Young v. Repine (In re Repine)*, 536 F.3d 512, 519 (5th Cir. 2008).

The Court finds that the series of initial inquiries by Hill seeking confirmation of the bankruptcy case and the treatment of his pre-petition claim is insufficient to establish the existence of a stay violation. Both sides were victimized by the failure of the notice process through the BNC in this instance and this failure was exacerbated by the feelings of distrust and suspicion between the parties. Hill was ill-informed and suspected that Collier was taking undue advantage of him. Ms. Taylor, Collier's bankruptcy attorney, was uninformed about the address snafu and had no reason to know that the notification system had failed to function properly. She understandably thought that one phone call should have been sufficient verification. She could not reasonably be expected to appreciate the rising frustration of Hill caused by the lack of written verification from the court. However, despite the fact that Collier and his attorney were not responsible for the circumstances that precluded Hill's receipt of timely communications from the

-9-

bankruptcy court, Hill cannot be fairly sanctioned in this environment for the actions he took in seeking to determine his precise status. It was not until Taylor forwarded the bankruptcy notice to Hill on May 7 that Hill possessed written confirmation of the existence of the bankruptcy case. Only at that point can he reasonably be charged with the knowledge that the bankruptcy case was not merely a ruse by Collier and that the automatic stay was indeed in effect. Thus, the  contacts occurring prior to May 7 cannot serve as the basis for any §362(k) liability.

That leaves two distinct incidents: (1) the posting of the demand letter of July 11th to Collier's bankruptcy attorney; and (2) the posting of the sign in Scottsville demanding payment of the debt. In both incidences, Hill knew the stay was in effect. The May 7th letter from Taylor enclosing the formal notice procured from PACER sufficiently evidenced the existence of the bankruptcy case. Hill then retained Maness whose investigations into the status of the bankruptcy and whose evaluations of that information were less than thorough. The July 11th demand letter sent by Maness actually references the bankruptcy filing, although it is apparent that Maness erroneously believed that the case had been closed and that his client was free to re-initiate collection proceedings. Yet another confirmation of the bankruptcy filing was issued by Taylor to Maness on July 23 in response to the demand letter, wherein she spoke to Maness and informed him that Collier's bankruptcy was indeed still active and that Hill's debt had been properly scheduled. Despite these repetitive confirmations, Hill rolled out the importunate sign

near the street in Scottsville a little over a week later.

As to the third element necessary to establish a claim under § 362(k), one must look first to the statute.  Section 362(a) of the Bankruptcy Code prohibits certain categories of actions.  *See* 11 U.S.C. § 362(a)(1)-(8).  One of the categories of prohibited action is "any act to collect, assess, or recover a claim against the debtor that arose before the commencement of the case."  11 U.S.C. § 362(a)(6).

To his credit, Hill does not seriously contest the fact that the demand letter constituted a stay violation.  Its contents conclusively demonstrate that Hill and his attorney knew of the existence of the bankruptcy case, yet made demand for the payment of the pre-petition debt because they erroneously believed that the Debtor had not placed it within the scope of the bankruptcy case.  While more provident minds would have come to the bankruptcy court for a formal determination of the situation,[13] or at least would have sought the services of an experienced bankruptcy attorney for an informal appraisal, Hill and his attorney reached an ill-informed conclusion based upon an insufficient investigation and then aggravated the situation by basing an aggressive collection action upon it.  This is not a technical violation based upon an innocent mistake as the Defendant contends.  This is precisely the type of behavior that the automatic stay is intended to preclude.

---

[13]   *See Chesnut*, 422 F.3d at 303 ["(B)y providing bankruptcy courts broad discretion to lift stays, Congress has evinced an intent to constitute the bankruptcy courts as the proper forum for the vindication of creditor rights."](citations omitted).

**-11-**

To the contrary, Hill vigorously contends that the posting of the Scottsville sign did not constitute a violation of the automatic stay.  Notwithstanding the actual language used in the sign, Hill contends that the purpose of the sign was not to collect the pre-petition debt, but instead "to inform the public that Collier wouldn't pay his debts and not to give him any credit."  He just wanted "to keep someone else from going through what [he] went through," and "to get a judgment, which is just another embarrassment thing."  Hill admitted that the overall dispute had become personal to him, notwithstanding the fact that he has already "written off the debt," and that the main purpose for posting the sign was to create embarrassment for the Debtor.

While embarrassing the Debtor in their shared community was certainly a motive of the Defendant, the Court finds that such a motive had an objective – to coerce the Debtor into paying his debt.   Had the sign contained only factual information regarding the existence of the debt, Hill's defense might resonate more.  Yet the factual information provided established the predicate for a particular directive — "WILL YOU PLEASE COME PAY ME!"  Hill claimed that the chosen words do not constitute an effort to collect the debt because there is no question mark at the end of the sentence.  Actually, the use of a exclamation mark in lieu of a question mark demonstrates exactly the opposite.  The exclamation mark transforms the sentence into a directive, which *demands* that the Debtor pay the debt.  The Bankruptcy Code is clear.  Any effort, action, or demand by a creditor to collect a pre-petition debt violates the automatic stay.  Thus, the posting of the

Scottsville sign was clearly an act to collect a debt in violation of the automatic stay.

*§362(a) and Free Speech*

Even if the posting of the sign did constitute a stay violation, Hill contends that he cannot be sanctioned for such action because of his entitlement to exercise his free speech rights under the First Amendment to the United States Constitution.  Hill asserts that principles expressed in *Turner Advertising Co. v. National Serv. Corp. (In re National Serv. Corp.)*, 742 F.2d 859 (5th Cir. 1984) and *Tantilla v. Stonegate Sec. Servs., Ltd.*, 56 B.R. 1014 (N.D. Ill. 1986) support his contention that his message posted upon the Scottsville sign constitutes protected speech, which cannot be legitimately curtailed by §362(a) nor punished by §362(k).[14]

While there are certainly components of speech involved in virtually every expression offered about the filing of a bankruptcy case, the automatic stay and the restrictions contained therein focus not upon speech but rather upon the restraint of *actions* — actions that threaten the core objectives of the Bankruptcy Code[15] and the judicial system designed to achieve those objectives.  It proscribes *conduct* — conduct that threatens the "breathing spell" and the "fresh start" to which an honest debtor under

---

[14]  *See Defendant's Supplemental Legal Briefing*, [dkt #39].

[15]  The automatic stay is dualistic in nature.  It protects debtors from "all collection efforts, all harassment, and all foreclosure actions," and it protects creditors by preventing some creditors from obtaining payment for their claims to the detriment of the other creditors.  *Sechuan City, Inc. v. North American Motor Inns, Inc. (In re Sechuan City, Inc.)*, 96 B.R. 37, 40 (Bankr. E.D. Pa. 1989).

-13-

this system is entitled as it fulfills the duty of full disclosure of its assets and liabilities —

as well as conduct that threatens the efficient marshaling of those assets in order to insure

a fair and equitable distribution to creditors. The scope of the automatic stay may at times

incidentally impact free speech, but those isolated intrusions are justified in order to

accomplish the significant governmental interest in providing uniform bankruptcy laws

and an effective means by which to implement them.[16]

Thus, a pattern of conduct by a creditor was found to be sanctionable, notwith-

standing the First Amendment when signs impugning the debtor's character were

repeatedly posted within the community and verbal assaults against the debtor by that

creditor after a bankruptcy filing were construed to constitute a post-discharge effort to

collect the debt owed to the creditor. *In re Andrus*, 189 B.R. 413, 416 (N.D. Ill. 1995)

[finding that "[T]he fact that [the creditor's] conduct contained a 'communicative

element'[did] not necessarily render it protected speech under the First Amendment."].

Similarly, a letter sent during the pendency of a bankruptcy case that detailed a debtor's

alleged indiscretions with consignment funds and pledged a creditor's dedication to

---

[16]   The stay therefore withstands constitutional scrutiny despite any incidental intrusion upon
expression under the test outlined in *United States v. O'Brien*, 391 U.S. 367, 376-77, 88 S.Ct. 1673,
1678-79, 20 L.Ed.2d 672 (1968):

[A] government regulation is sufficiently justified if it is within the constitutional power
of the Government; if it furthers an important or substantial governmental interest; if the
governmental interest is unrelated to the suppression of free expression; and if the
incidental restriction on the alleged First Amendment freedoms is no greater than is
essential to the furtherance of that interest.

*Id.* at 377.

-14-

spreading the word to the local community about the debtor's "scam" in order to "protect the public" subjected its producer to sanctions under §362 upon a finding that such actions were designed to collect a debt in a manner extraneous to that imposed by the Bankruptcy Code.  *In re Crudup*, 287 B.R. 358, 362 (Bankr. E.D.N.C. 2002).

As to the two cases cited by Hill as authority for the proposition that his Scottsville sign constituted protected free speech, those cases merely constitute examples in which the messages conveyed were not construed to be an effort to collect an underlying debt. In the *National Service* case, the Fifth Circuit held that an advertising agency could not be enjoined from posting billboards that read, "Beware, This Company Is In Bankruptcy" and "Beware, This Company Does Not Pay Its Bills."  In its review of the issuance of injunctions against such publications, the Circuit noted that the message in each of those signs "simply states two unassailable facts, that [the debtor] is in bankruptcy and that [the debtor] cannot pay its bills."  742 F.2d at 862.  In dissolving the injunctions, the Circuit observed that the only threat to the debtor posed by the language on the billboards "was that the consumers in the Atlanta area would become familiar with [the debtor's] bankruptcy," and concluded that such a threat did not warrant the use of a prior restraint of free speech.  *Id.*

In *Stonegate*, a creditor utilized a parked truck to express its dissatisfaction with a debtor's behavior.  It painted the truck with the words "Stonegate Auto Alarms does not pay supplier" and "Crime does not pay, Stonegate Auto Alarms the same way" and then

placed the truck outside of the debtor's business.  In reversing a trial court finding, issued

without a hearing, that the action constituted an improper harassment of the debtor for the

purpose of collecting a debt, the United States District Court for the Northern District of

Illinois held that, though §362 could constitutionally curtail harassing speech in certain

circumstances, the "language used did not present a clear and present danger of frustrating

the reorganization in any degree and was therefore deserving of First Amendment

protections."  56 B.R. at 1020.  The Court was convinced that there was no desire by the

creditor to impede the bankruptcy process because it was that creditor who had, in fact,

initiated the bankruptcy process through the filing of an involuntary petition.[17]

In both instances cited by Hill, therefore, no threat to the debtor's protections under

the Code or to the principles of equitable distribution were presented.  By contrast, Hill's

posting of the Scottsville sign was not merely for informational purposes.  It did not

constitute unfettered speech.  By its literal language, the sign sought to compel Collier to

pay the $984.23 unsecured debt to Hill, notwithstanding the Debtor's compliance with his

duties under the Code and without reference to what other creditors similarly situated to

Hill might be paid from Collier's bankruptcy estate.  It thus constituted prohibited conduct

— an attempt to collect a pre-petition debt to the detriment of the other unsecured

creditors and in circumvention of the Debtor's legitimate effort to reorganize his financial

---

[17]  It is significant that little attention is paid in either *National Service* or *Stonegate* to the
significant purpose sought to be achieved by §362 or the deleterious effect of debt collection activities
pursued outside of the scope of an existing bankruptcy case.

affairs under the protection of this Court.  Such conduct is appropriately proscribed by §362(a) which ensures the effective implementation of the bankruptcy system designed by Congress without unconstitutionally infringing upon the free speech rights of Hill.

*Damages*

Section 362(k) provides that "an individual injured by any willful violation of a stay provided by this section shall recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages."  Thus, even if the evidence establishes the existence of a willful stay violation, a debtor must still establish actual damages, though the damage provisions of §362(k) are stated in mandatory terms. *In re All-Trac Transp., Inc.,* 223 Fed. Appx. 299 *3 (5th Cir. 2006) [requiring connection of stay violations to "identifiable losses"]; *In re Perrin*, 361 B.R. 853, 856 (B.A.P. 6th Cir. 2007); *In re L'Heureux,* 322 B.R. 407, 411 (B.A.P. 8th Cir. 2005).  "An award of actual damages under §362(h) [now (k)] must have a sufficient factual foundation." *In re Sucre*, 226 B.R. 340, 349 (Bankr. S.D.N.Y. 1998).  Thus, damages under §362(k) must be proven with reasonable certainty and may not be speculative or based on conjecture.  *In re Archer*, 853 F.2d 497, 499-500 (6th Cir. 1988); *In re Frankel*, 391 B.R. 266, 272 (Bankr. M.D. Pa. 2008); *Hutchins v. Ocwen Federal Bank, FSB (In re Hutchins)*, 348 B.R. 847, 893 (Bankr. N.D. Ala. 2006).   The Debtor asserted the existence of actual damages in the aggregate amount of $41,881.28:  consisting of lost wages of $1,320; emotional damages of $21,000; and attorneys' fees of $19,561.28.

As for lost wages, the Debtor testified without contradiction that he missed two days of work due to court appearances and at least three days of work due to illness and medical appointments resulting from the traumatic impact of the Scottsville sign.  Collier testified credibly regarding the consternation caused in that little community by the posting of the sign and the negative impact which that local controversy imposed upon his health.  Collier's uncontested testimony established that he receives $24.00 per hour for a normal work day and that his employer requires employees in his position to work 11 hours a day.  Thus, for the five workdays for which Collier forfeited his wages, the Court shall award the sum of $1,320.

Collier also requests an award of emotional damages in the amount of $21,000.00 — $1,000 per day for each of the 21 days during which the Scottsville sign was posted. The Fifth Circuit has not yet determined under what circumstances, if at all, an individual may claim emotional distress damages as a component of an award of actual damages under §362(k).  *In re Repine*, 536 F.3d at 522.[18]  It did state in *Repine* that, if such a right exists, it would certainly require the presentation of "specific information" concerning the damages caused by an individual's emotional distress rather than relying only on

---

[18]   An individual's right to recover damages for emotional distress under §362(k) has been recognized by one circuit court, *Dawson v. Washington Mutual Bank (In re Dawson)*, 390 F.3d 1139 (9th Cir. 2004) and another has noted in dicta that "emotional damages qualify as 'actual damages' under §362(h) [now (k)]. *Fleet Mortgage Group, Inc. v. Kaneb*, 196 F.3d 265, 269-70 (1st Cir. 1999). *But see Aiello v. Providian Fin. Corp.*, 239 F.3d 876, 881 (7th Cir.2001).  Even if the recovery of such damages is recognized, the debtor must be prepared to prove "that his emotional distress is more than fleeting, inconsequential, and medically insignificant."  *Nibbelink v. Wells Fargo Bank, N.A. (In re Nibbelink)*, 2009 WL 794502 *4 (Bankr. M.D. Fla., Feb. 11, 2009).

generalized assertions.  *Id.* at 521-22.

While a court must cautiously examine the proof which is tendered in support of a such a claim, this Court believes that, in shaping a remedy that only permits individuals to recover for damages inflicted by a creditor's violation of the automatic stay, §362(k) encompasses an individual's right to recover for any emotional distress caused by that violation.  Because the difficulty in assessing emotional distress damages suffered by humans transcends the various areas of substantive law in which those damages might arise, the Court is guided by those principles previously articulated by the Fifth Circuit in granting monetary relief for such damages:

> For starters, we have emphasized that "hurt feelings, anger and frustration are part of life," and are not the types of emotional harm that could support an award of damages.  The plaintiff must instead present specific evidence of emotional damage . . . a specific discernable injury to the claimant's emotional state, proven with evidence regarding the nature and extent of the harm.  To meet this burden, a plaintiff is not absolutely required to submit corroborating testimony (from a spouse or family member, for example) or medical or psychological evidence.  The plaintiff's own testimony, standing alone, may be sufficient to prove mental damages but only if the testimony is particularized and extensive enough to meet the specificity requirement discussed above.  Neither conclusory statements that the plaintiff suffered emotional distress nor the mere fact that a . . . violation occurred supports an award of compensatory damages.

*Hitt v. Connell*, 301 F.3d 240, 250-51 (5th Cir. 2002).

The Court concludes that the Debtor has introduced credible evidence to meet this

articulated standard.  Having previously been considered a respected member of this small community as reflected by his 3-term service as the local representative on the Marshall school board,[19] Collier testified that the posting of the Scottsville sign regarding his debt was controversial within the community and purposefully subjected him to ridicule.  He felt compelled to maintain a low profile in the community during its existence.  The furor among his friends and neighbors caused him sleep deprivation and resulting fatigue.  He experienced headaches.  These physical manifestations were corroborated by his ex-wife and by his son who testified that this incident in this little community had changed the Debtor's temperament from relaxed to one of constant irritability.  They observed that he is more guarded and less talkative.  His acid reflux medication was doubled by his physician, and medical treatment was also required for a face and body rash that his doctor attributed to stress.

The damages inflicted upon Collier by Hill's intentional act of defiance against the automatic stay are discernable and verifiable.   However, they are not easy to quantify.  Setting aside the lost wages previously awarded, there is no additional evidence of financial loss attributable to this distress.  While this infliction of damage was not imaginary, Collier's request for an award of $1,000 per day seems contrived and punitive.  Given that no award is warranted for mere anger or embarrassment and that caution must be exercised in compensating a plaintiff for this type of injury, the Court shall award the

---

[19]   The final term of his board service ended approximately two and one-half months prior to the erection of the sign.

-20-

aggregate sum of $1,500 for the emotional damages suffered by Collier.

As the final component of actual damages contemplated by §362(k), Collier requests a recovery of attorney's fees in the amount of $18,242.25 and reimbursement of expenses in the amount of $444.03 to Chuck Newton and Associates, as well as $875 in fees to his bankruptcy counsel, Jean Taylor.  Although §362(k) "does not limit the amount of attorneys' fees and costs to be awarded under that section, courts have determined that such an award must be 'reasonable and necessary,' and that courts should 'closely scrutinize the fees requested by attorneys for unnecessary and excessive charges.'" *In re Parry,* 328 B.R. 655, 659 (Bankr. E.D.N.Y. 2005); *Harris v. Memorial Hosp. (In re Harris)*, 374 B.R. 611, 617 (Bankr. N.D. Ohio 2007).   The Court has closely scrutinized the 19-page fee exhibit tendered by Newton and Associates to determine whether the services and expenses outlined therein were actual, reasonable and necessary in representing the interests of the Plaintiff.[20]   Though the sum is substantial, the quantum of services necessary to obtain relief in this instance was aggravated by Hill's refusal to take down the Scottsville sign, thus requiring the Plaintiff to seek an emergency hearing and the entry of a preliminary mandatory injunction to force the removal of the sign (to which the Defendant ultimately agreed at the hearing).   The Plaintiff was also required to respond to a Defendant's motion to dismiss the adversary complaint that contained argument and applicable authorities, discovery was initiated prior to the final trial, and

---

[20]  Plaintiff's Ex. 7.

greater time was required to research and prepare a reasoned response to the Defendant's free speech arguments. Therefore, the Court finds that the Plaintiff should be awarded the sum of $15,750 for fees and expenses incurred by Newton and Associates. While such amounts may be higher than normally awarded in this context, they are justified under the circumstances of this case.

As for Jean Taylor, the Court finds that an award to the Plaintiff of $250 [2 hrs. @$125/hr.] for her services is appropriate. The Court finds that the remaining 5 hours requested for Taylor's services were subsumed into her election of the "no-look" fee authorized under LBR 2016(h) and which has been paid to her under the terms of the confirmed Chapter 13 plan in Collier's underlying bankruptcy case. Thus, the Court awards to Collier reasonable attorney's fees and expenses in the aggregate amount of $16,000.00.

Finally, Collier seeks an award of punitive damages against Hill. §362(k) provides that an individual injured by a willful violation of the automatic stay "...in appropriate circumstances, may recover punitive damages." The availability of punitive damages in this context "encourages would-be [stay] violators to obtain declaratory judgments before seeking to vindicate their interests in violation of an automatic stay, and thereby protects debtors' estates from incurring potentially unnecessary legal expenses in prosecuting stay violations." *In re Crysen/Montenay Energy Co.*, 902 F.2d 1098, 1105 (2d Cir. 1990). Such damages are generally designed to cause a change in the creditor's behavior,

*Heghmann v. Indorf (In re Heghmann)*, 316 B.R. 395, 406 (B.A.P. 1st Cir. 2004) and

serve as a deterrent to certain actions of creditors and are only awarded where the conduct

is egregious or vindictive. *Id; Davis v. Matt Gay Chevrolet, Inc., (In re Davis)*, 374 B.R.

366, 373 (Bankr. S.D. Ga. 2007). The Fifth Circuit recently endorsed that egregious

conduct standard and confirmed that the existence of "appropriate circumstances" for the

application of punitive damages under §362(k) requires a finding of "egregious,

intentional misconduct on the violator's part."[21]  *In re Repine*, 536 F.3d at 521.

   As explained earlier, Hill made two conscious choices after receiving written

confirmation of the existence of Collier's bankruptcy case:  (1) he elected to avoid

making any inquiry with this Court to confirm the information that he had received from

the Debtor or to answer any remaining doubts that he might have had about the

bankruptcy case; and (2) he elected instead to send a demand letter to the Debtor based

upon erroneous assertions that would have been corrected had he chosen to make any

inquiry of the bankruptcy court.  That was an action taken with reckless disregard as to

whether the automatic stay was in effect.  He then dramatically exacerbated the situation

by posting the Scottsville sign with actual knowledge of, and absolutely no regard for, the

existence of the automatic stay — hoping that the shame and embarrassment imposed

upon the Debtor in their small community would induce him to pay the pre-petition debt.

   This clearly constitutes egregious behavior that simply cannot be tolerated nor

---

[21]   The Fifth Circuit noted that a district court in the Southern District of Texas had previously
endorsed the same "egregious conduct" standard in *In re Lile*, 161 B.R. 788, 792 (S.D. Tex. 1993).

excused.  The nature of Hill's conduct in this case demonstrates a willful disregard and

disdain for the processes and protections afforded to bankruptcy debtors through the

automatic stay.  Quite frankly, Hill did not take the slightest steps to confirm the existence

of the automatic stay because he did not wish to be bound by the restrictions of that stay.

It is a pattern of behavior which strikes at the very core of the bankruptcy system and the

manner in which the system is administered.[22]  Though Mr. Hill claims only limited

exposure to the bankruptcy process, the purposes for which the automatic stay was

designed by Congress are too critical to sanction the use of any type of defense based

upon ignorance.[23]  *Moser v. Mullican (In re Mullican)*, 2008 WL 5191196 *11 (Bankr.

E.D. Tex., Sept. 30, 2008); *In re Spinner*, 398 B.R. 84, 94 (Bankr. N.D. Ga. 2008).

The assessment of punitive damages in this context are thus necessary in this

context, not only to further the purposes of the automatic stay, but also to provide an

appropriate deterrent against persons such as this Defendant who tries to weigh the risks

---

[22]  Thus, these circumstances are clearly distinguishable from those found in *In re Young*, 117 B.R. 251 (Bankr. E.D. Tex. 1990).  This was not a *de minimis* violation prosecuted by the Plaintiff for the purpose of obtaining attorney fees.  These are serious actions taken by Hill when he knew that the bankruptcy process had been initiated and a reasonable investigation would have revealed that his claim was subject to that process.  In the same way that a *de minimis* violation of the stay should not be ennobled by the award of attorney fees, serious violations of the automatic stay must be addressed in a serious manner in order to preserve the integrity of the bankruptcy process.

[23]  In order to evaluate more precisely the propriety of a punitive damage assessment, courts have also examined the following considerations: (1) the nature of the respondent's conduct; (2) the motives of the respondent; (3) any provocation by the debtor; and (4) the respondent's ability to pay.  *Diviney v. Nationsbank of Texas, N.A. (In re Diviney)*, 225 B.R. 762, 777 (B.A.P. 10th Cir. 1998) *In re Lightfoot,* 399 B.R. 141, 150 (Bankr. E.D. Pa. 2008);  In addition to the four cited factors, some courts also mention a fifth factor — the nature and extent of the harm to the debtor.  *In re Galmore,* 390 B.R. 901 (Bankr. N.D. Ind. 2008); *Roche v. Pep Boys, Inc. (In re Roche)*, 361 B.R. 615, 624 (Bankr. N.D. Ga. 2005). These factors all support the assessment of punitive damages against Hill in this case.

associated with committing a willful violation of the automatic stay.  Strong penalties must be assessed in order to eliminate all viable options for a creditor other than its absolute recognition of the existence of the stay and the need to seek any relief from the stay only through the designated procedures of the bankruptcy court.

This Court thus concludes that the assessment of punitive damages against this Defendant is appropriate.  However, since "the primary purpose of punitive damages is to cause change in the respondent's behavior and the prospect of such change is relevant to the amount in which punitive damages ought to be granted," *In re Riddick*, 231 B.R. at 268, the Court will exercise restraint in the assessment of punitive damages based upon the negative impact already inflicted upon the Defendant by the actual damages award in this case (as compared to his $984.23 unsecured claim), as well as the belief that this Defendant will continue to exercise the sound judgment that produced the entry of the agreed preliminary injunction in this case (which precluded the assessment of significantly higher damages in this case) and that he will not repeat this misbehavior in the future.  Accordingly, in light of all of the circumstances presented in this case, the Court will impose punitive damages against Hill in the amount of $3,000.00.  In the event that this Court's faith is misplaced and Hill reposts the Scottsville sign or takes another action in violation of the automatic stay subsequent to the entry of judgment in this case, the punitive damage award will be supplemented by the amount of $500.00 per calendar day for any subsequent stay violation by Hill in this case.

Accordingly, the Court concludes that the Debtor-Plaintiff, James Bradley Collier, shall recover from the Defendant, Paul Hill, actual damages in the sum of $18,820.00, plus punitive damages in the amount of $3,000.00, for an aggregate award of $21,820.00, to be supplemented, if necessary, by an additional award of punitive damages in the amount of $500 per calendar day for any subsequent stay violation by Hill, with post-judgment interest on such sums at the current federal post-judgment interest rate of 0.58% until paid, with all court costs, if any, taxed against the Defendant.[24]

This memorandum of decision constitutes the Court's findings of fact and conclusions of law[25] pursuant to Fed. R. Civ. P. 52, as incorporated into adversary proceedings in bankruptcy cases by Fed. R. Bankr. P. 7052. An appropriate judgment shall be entered which is consistent with this opinion.

Signed on 04/07/2009

THE HONORABLE BILL PARKER
CHIEF UNITED STATES BANKRUPTCY JUDGE

---

[24] The Court declines to award pre-judgment interest in this particular context. Federal law governs the allowance of prejudgment interest when a cause of action arises from a federal statute. *Matter of Tex. Gen. Petroleum Corp.*, 52 F.3d 1330, 1339 (5th Cir. 1993). Federal courts apply a two-step analysis to determine whether an award of prejudgment interest is within a court's discretion: (1) whether the federal act that creates the cause of action precludes such an award; and (2) whether such an award furthers the congressional policies of the federal act. *Id.* While the Court believes that it possesses the discretion in this context to award pre-judgment interest since there is no preclusion referenced in the statute and an award could enhance the policies embraced by §362(k), it declines to do so in this instance in light of the fact that the impetus for much of the damages (the Scottsville sign) was neutralized as this decision was under consideration due to the pendency of the preliminary injunction issued in this case, the amount which could be assessed under the applicable rate ($73.50) has a *de minimis* effect on statutory policies, and any delay in issuing judgment is more fairly attributed to the Court rather than to the Defendant.

[25] To the extent that any finding of fact is construed to be a conclusion of law, it is hereby adopted as such. To the extent any conclusion of law is construed to be a finding of fact, it is hereby adopted as such. The Court reserves the right to make additional findings and conclusions as necessary or as may be requested by any party.